IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION


AMANDA G. STARKS                          )
                                          )
v.                                        )        NO. 3:09-0062
                                          )
MICHAEL J. ASTRUE,                        )
Commissioner of Social Security           )


To: The Honorable John T. Nixon, Senior District Judge


## REPORT AND RECOMMENDATION

The plaintiff filed this action pursuant to 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of Social Security denying her Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act ("the Act").

Upon review of the administrative record as a whole, the Court finds that the Commissioner's determination that the plaintiff was not disabled under the meaning of the Act is not supported by substantial evidence in the record as required by 42 U.S.C. § 405(g), that the plaintiff's motion for judgment on the record (Docket Entry No. 18) should be granted in part, the defendant's motion for "judgment on the pleadings" (Docket Entry No. 21) should be denied,[1] and this case should be remanded for further action in accordance with the recommendations contained herein.

---

[1] For some inexplicable reason, the defendant filed its own motion for "judgment on the pleadings" rather than filing a response to the plaintiff's motion for judgment on the record. Apparently construing the defendant's motion as a response to her motion, the plaintiff filed a reply (Docket Entry No. 25).

# I. INTRODUCTION

The plaintiff filed an application for DIB and SSI on August 29, 2003, alleging a disability onset date of June 25, 2003, due to bulging discs in her lower back, degenerative disc disease, and arthritis.[2] (Tr. 58-60, 76.) Her applications were denied initially and upon reconsideration. (Tr. 47-50, 53-56.) A hearing before Administrative Law Judge ("ALJ") Mack Cherry was held on September 20, 2006. (Tr. 1012-56.) The ALJ delivered an unfavorable decision on March 9, 2007 (tr. 16-24), and the plaintiff sought review by the Appeals Council. (Tr. 12.) On December 5, 2008, the Appeals Council denied the plaintiff's request for review (tr. 6-8), and the ALJ's decision became the final decision of the Commissioner.

# II. BACKGROUND

The plaintiff was born on May 11, 1967, and was 36 years old as of June 25, 2003, her alleged onset date. (Tr. 58.) She completed high school (tr. 83) and worked as a cashier, parts assembler, assistant manager in a grocery store, and fast food worker. (Tr. 76, 1049.)

## A. Medical Records[3]

In January of 2002, the plaintiff presented to NorthCrest Medical Center ("NorthCrest") and underwent three MRIs of her spine, which revealed disc space narrowing and bulging at the L4-5 and L5-S1 levels. (Tr. 198-99, 201.) The plaintiff also presented to Family Health Care Associates

---

[2] The plaintiff's SSI application is not included in the record.

[3] The plaintiff's recent medical history includes medical consultations for a variety of conditions not at issue here, including colorectal and sinus problems, chest pain, and shortness of breath. To the extent they are reflected in the record, they are acknowledged but not considered otherwise influential to the Court's analysis or decision.

of Greenbrier ("FHCA") with complaints of worsening back pain and numbness in her legs. (Tr. 213-14.) She reported that in December of 2001, she heard "something pop in her low back," went to a local clinic and received "some injections," and was prescribed Ultram,[4] Naproxen,[5] and Skelaxin.[6] (Tr. 214.) Donna Hall, a family nurse practitioner at FHCA, examined the plaintiff, noted that she was obese, and diagnosed her with lumbar back pain, pain and numbness in both legs, degenerative disc disease, and hypertension. (Tr. 213-14.) The plaintiff was prescribed Zestril,[7] Relafen,[8] Darvocet,[9] and Zanaflex,[10] was referred to Dr. Scott Standard, a neurosurgeon with Neurological Surgeons, PC ("Neurological Surgeons"), and was cleared "to return to work on limited duty." *Id.*

On January 16, 2002, the plaintiff presented to Dr. Standard with complaints of significant back pain, reporting that her pain was an eight out of ten, and he diagnosed her with symptomatic lumbar radiculopathy. (Tr. 178-79.) Dr. Standard ordered epidural steroid injections and physiotherapy, prescribed Relafen and Zanaflex, and recommended that she "be on light duty for the next 4 weeks." *Id.* On January 30, 2002, the plaintiff returned to Neurological Surgeons for her second epidural steroid injection and reported a 50% improvement in her pain symptoms from her

---

[4] Ultram is a centrally acting opioid analgesic that is used to treat arthritis and musculoskeletal pain. Physician's Desk Reference 2693 (64th ed. 2010) ("PDR").

[5] Naproxen is a non-steroidal anti-inflammatory drug ("NSAID"). PDR at 2850.

[6] Skelaxin is a skeletal muscle relaxant. Saunders Pharmaceutical Word Book 646 (2009) ("Saunders").

[7] Zestril is an antihypertensive and ACE inhibitor. Saunders at 776.

[8] Relafen is an analgesic and NSAID prescribed for chronic arthritis. Saunders at 607.

[9] Darvocet is a narcotic painkiller and fever reducing drug. Saunders at 202.

[10] Zanaflex is a skeletal muscle relaxant and antispasmodic. Saunders at 773.

initial injection and that her pain was a five out of ten. (Tr. 175.)  On February 20, 2002, the plaintiff presented to Neurological Surgeons with complaints of increased back pain and reported that her pain was a nine out of ten. (Tr. 171-72.)  She received a third epidural steroid injection in her back and Dr. Standard prescribed Neurontin.[11] *Id.*

On February 21, 2002, the plaintiff presented to the Saint Thomas Hospital Emergency Room with complaints of persistent and worsening lower back pain that radiated down her legs. (Tr. 159.)  She was admitted to the hospital and a lumbar myelogram and lumbar spine CT scan showed that she had a "bulging disc at the L4-5 level without evidence of nerve root sleeve cutoff" and "[v]entral insensitivity at the L5-S1 level." (Tr. 161-62.)  Dr. Standard discharged the plaintiff on February 22, 2002, noting that her pain was controlled. (Tr. 157.)  He instructed her to avoid any strenuous activity, until her follow-up appointment, prescribed Percocet,[12] Neurontin, and Medrol,[13] and indicated that she could return to work in one week. *Id.*  On March 8, 2002, Dr. Standard opined that "surgical treatment" would not be helpful to the plaintiff and he referred her to a pain management clinic. (Tr. 171.)

On March 26, 2002, the plaintiff returned to Neurological Surgeons and Julianne LaGasse, a general nurse practitioner, examined the plaintiff and found that she had a normal range of motion but increased pain with flexion and some decreased muscle strength in her lower extremities.

---

[11] Neurontin is used to treat nerve pain. Saunders at 488.

[12] Percocet is an opioid painkiller and anti-inflammatory medication. PDR at 1121.

[13] Medrol is a corticosteroid and anti-inflammatory. Saunders at 433.

(Tr. 170.)  The plaintiff was prescribed Neurontin. *Id.*  She also presented to FHCA and Ms. Hall diagnosed her with edema of the lower extremities and prescribed Lasix.[14]

In April of 2002, the plaintiff presented to STAR Physical Therapy ("STAR") on several occasions for treatment of her lumbar radiculopathy. (Tr. 166-69.)  Treatment notes indicate that she rated her back and leg pain as a six out of ten,  had major limitations in all lumbar range of motion exercises, had worsening back and lower extremity pain,  and  was referred back to Dr. Standard "for further intervention." *Id.*  On April 10, 2002, the plaintiff presented to Dr. Douglas Mathews, a neurosurgeon with Neurological Associates, and he diagnosed her with "[l]umbar degenerative disc disease with mechanical back pain and radiculopathy" and recommended that she attend physical therapy and take anti-inflammatory medication, muscle relaxants, and mild pain relievers. (Tr. 400.)  On May 3, 2002, Dr. Standard examined the plaintiff and found that her "MRI scan and myelogram were both negative, except for some degenerative disc disease." (Tr. 169.)

Between May and August of 2002, the plaintiff presented to FHCA on several occasions and Ms. Hall opined that she had hypertension, pain in her left ear and left neck, low back pain, left arm numbness, and rectal bleeding which may have been a side-effect of her anti-inflammatory medication. (Tr. 207-10.)  She was prescribed Zestril and Ultram. *Id.*  An August 30, 2002, MRI of the plaintiff's cervical spine revealed that she had "[r]eversal of the normal cervical lordosis" but "[n]o focal or acute bony abnormality appreciated." (Tr. 203.)

In September of 2002, the plaintiff presented to The Pain Management Group ("PMG") with complaints of lower back pain and Dr. Stephen Long noted that x-rays of the plaintiff's lumbar spine showed a "[m]arked decrease in disc height at L4-5 and L5-S1," that she was able to ambulate

---

[14] Lasix is prescribed to treat hypertension. Saunders at 398.

without difficulty, and she had a full range of motion in her cervical and lumbar spine and upper and lower extremities. (Tr. 194-96.)  The plaintiff related that her back pain was a ten out of ten on her worst day and a two out of ten on her best day, and that bending, prolonged standing, and sitting exacerbated her pain. (Tr. 193.)  Dr. Long diagnosed the plaintiff with lumbar degenerative disc disease and with "rule out lumbar radiculopathy" (tr. 194), and she received an epidural steroid injection. (Tr. 191.)

The plaintiff returned to PMG on October 4, 2002, and complained that "she hurt worse" after the epidural steroid injection, that she had increased weakness in her left leg, that Ultram was "not helpful," and that her pain was a six out of ten. (Tr. 188-89.)  The plaintiff was diagnosed with lumbar degenerative disc disease and she was prescribed Lortab.[15] *Id.*

From January to September of 2003, the plaintiff presented to Matthew Walker Comprehensive Health Center on multiple occasions with complaints of lower back pain. (Tr. 219-33.)  The plaintiff reported that her back pain was a seven out of ten and eight out of ten (tr. 222, 232) and that she was able to dress herself, cook meals, and go shopping. (Tr. 220, 222, 227, 229, 232.)  She was diagnosed with lower back pain, degenerative changes in her spine, radiculopathy, obesity, hypertension, and sinusitis, and she was prescribed Lortab, Skelaxin, Celebrex,[16] and Flexeril.[17] (Tr. 221, 223, 226, 228, 231.)

Between October and December of 2003, the plaintiff presented to Dr. Michael Rhodes of the Millbrook Medical Center several times with complaints of lower back pain and chest pain.

---

[15] Lortab is a pain reliever with the generic name of hydrocodone. Saunders at 415.

[16] Celebrex is a NSAID that is prescribed for arthritis and acute pain. Saunders at 3727.

[17] Flexeril is a skeletal muscle relaxant. Saunders at 294.

(Tr. 388-98.) Dr. Rhodes diagnosed her with lower back pain, sinusitis, gastroesophageal reflux disease ("GERD"), asthma, muscle spasms, hypertension, and anxiety; prescribed Ambien,[18] Lortab, antibiotics, and allergy medication; and referred her to Dr. Avis Walters, a physician at a pain management clinic. *Id.*

On December 23, 2003, the plaintiff presented to Dr. Walters with complaints of pain in her lower back, lower extremities, and neck, and pain and numbness in her arms and hands. (Tr. 341.) Dr. Walters prescribed massage, ultrasound, electrical stimulation, and heat packs. (Tr. 340.) On January 27, 2004, the plaintiff returned to Dr. Walters and reported that her pain was worsening, that her pain was a seven out of ten with medication and ten out of ten without medication, and that although changing positions reduced her pain levels, "small activities of daily living," such as washing dishes and sweeping, exacerbated her pain. (Tr. 337.) Dr. Walters diagnosed the plaintiff with degenerative disc disease, morbid obesity, radiculopathy, myofascial pain syndrome, and reduced leg strength and left hand grip strength. (Tr. 337-38.) He referred the plaintiff for an MRI of her lumbar, thoracic, and cervical spine, and recommended that she begin using a cane. (Tr. 338.)

On January 8, 2004, an MRI of the plaintiff's cervical spine revealed a right paracentral disc protrusion at C6-7 and a mild deformity of the spinal cord that was potentially the source of her radiculopathy (tr. 359), an MRI of her lumbar spine revealed degenerative disc disease and disc bulging (tr. 360), and an MRI of her thoracic spine revealed a moderate sized disk herniation that could be the potential source of the plaintiff's radiculopathy. (Tr. 361.) Additionally, in January and February of 2004, the plaintiff participated in sleep studies at NorthCrest which indicated that she

---

[18] Ambien is prescribed for the short-term treatment of insomnia characterized by difficulties with sleep initiation. Saunders at 2921.

had mild-obstructive sleep apnea that significantly improved when she was on a continuous positive airway pressure breathing therapy ("C-PAP") machine. (Tr. 344-48.)

Between February of 2004 and August of 2005, the plaintiff presented to Medical Necessities Pain Clinic ("Medical Necessities") on multiple occasions with complaints of pain in her back, neck, legs, shoulders, and wrists. (Tr. 901-74.)  She reported that her pain was "throbbing" and "always there," and she repeatedly classified it as between six and nine out of ten in severity. *Id.*  The plaintiff was diagnosed with degenerative disc disease, low back pain, radiculopathy, disc herniation, neck pain, wrist pain, stenosis, obesity, and depression (tr. 901-29, 951), and was prescribed Lortab, Avinza, Robaxin,[19] Neurontin, and Flexeril. (Tr. 901-29, 975-1008.)  She also received physical therapy treatment such as massage, ultrasound, electrical stimulation, and heat packs. (Tr. 901-60.)

From July of 2004 to July of 2005, the plaintiff presented to Dr. Panchanan Satpathy, a urologist, on multiple occasions with complaints of having difficulty urinating. (Tr. 873-89.)  Dr. Satpathy diagnosed the plaintiff with urinary incontinence, depression, and anxiety, and prescribed Detrol[20] and Ditropan.[21] *Id.*

On July 19, 2004, the plaintiff returned to Dr. Mathews with complaints of pain in her neck, mid-back, and low back and numbness and tingling in her arms and legs. (Tr. 399.)  Dr. Mathews noted that the plaintiff walked with a cane and had back and neck pain but that she had full strength and "[n]ormal sensation in her upper and lower extremities." *Id.*  He diagnosed her with "[l]umbar

---

[19] Robaxin is a skeletal muscle relaxant. Saunders at 619.

[20] Detrol is prescribed for urinary frequency, urgency, and incontinence. Saunders at 214.

[21] Ditropan is a urinary antispasmodic for urge urinary incontinence and frequency. Saunders at 236.

degenerative disc disease with mechanical back pain and radiculopathy" and related that surgical intervention for her cervical, thoracic, and lumbar spine would not be effective since she demonstrated only "mild" degenerative disc disease and disc herniation. (Tr. 399-400.) Dr. Mathews recommended physical therapy and that she take "anti-inflammatory agents, muscle relaxants, and mild pain medication." (Tr. 400.)  On August 17, 2004, MRIs of the plaintiff's lumbar spine, thoracic spine, and cervical spine revealed evidence of degenerative disc disease and spondylosis. (Tr. 863-66.)

On August 24, 2004, the plaintiff presented to Dr. Stephen Larson, an orthopaedist with Middle Tennessee Orthopaedics, with complaints of bilateral carpal tunnel syndrome.  (Tr. 899.) Dr. Larson diagnosed the plaintiff with "[b]ilateral carpal tunnel syndrome, left greater than right" and referred her to occupational therapy for "routine carpal tunnel rehab with wrist splints."[22] *Id.* On September 13, 2004, upon referral from Dr. Rhodes the plaintiff presented to Dr. Robert S. Davis, a neurologist, with complaints of mechanical neck, mid back, and lower back pain, bilateral upper and lower extremity pain, and wraparound chest pain. (Tr. 795.)  Dr. Davis noted that the plaintiff's motor strength was five out five, that her mental status was intact, and that she used a cane, and he opined that her "[subjective complaints [were] compatible with mechanical neck pain, mid back pain and lower back pain, and . . . with bilateral upper extremity cervical radicular and/or carpal tunnel symptoms, and bilateral lower extremity radicular symptoms." (Tr. 795-96.)  He recommended that the plaintiff use a lumbar brace, cervical collar, and carpal tunnel splints for both wrists. (Tr. 796.)

---

[22] The record does not contain any "occupational therapy" reports as a result of Dr. Larson's referral.

In October and November of 2004, Kendra Bellamy, a nurse practitioner in Dr. Davis's office, examined the plaintiff and noted that she had five out of five strength in her upper and lower extremities, normal reflexes, and ambulated with a cane. (Tr. 793-94.) She diagnosed the plaintiff with mechanical neck pain, bilateral upper extremity pain, and "left carpal tunnel syndrome versus cervical radiculopathy." *Id.* In December of 2004, and January of 2005, Dr. Davis examined the plaintiff on two occasions (tr. 792) and performed a cervical diskectomy. (Tr. 432-33, 790-91.) A surgical pathology report on the plaintiff's bone and soft tissue, extracted during her surgery, indicated that her Hyaline cartilage displayed degenerative changes. (Tr. 894.)

On January 31, 2005, Dr. Ramesh Chadalavada, a physician at NorthCrest, completed a sleep study and opined that the plaintiff had mild obstructive sleep apnea and hypersomnia. (Tr. 489-90.) He recommended that the plaintiff use her C-PAP machine for at least six to eight hours at night, avoid taking sedatives and sleep-promoting medications during the day, improve her sleep hygiene, lose weight, and avoid alcohol, caffeine, and nicotine. (Tr. 490.) On February 14, 2005, Dr. Davis examined the plaintiff and opined that x-rays of the plaintiff's cervical spine showed that her fused cervical discs were stable. (Tr. 789.) He also noted that the plaintiff could "resume her activities as tolerated." *Id.* On March 17, 2005, the plaintiff underwent a Nerve Conduction Study ("NCS")/Electromyography ("EMG") study[23] of her right and left arms that was "normal" except for a "[n]on-specific chronic right C6/7 radicular changes in one muscle only." (Tr. 492.)

From March to November of 2005, the plaintiff presented to Dr. Rhodes on multiple occasions and he diagnosed her with hypertension, right shoulder pain, lower back pain, hip pain,

---

[23] An EMG/NCS study measures the electrical activity of muscles at rest and during contraction, and measures how well and how fast the nerves can send electrical signals. WebMD, "Electromyogram (EMG) and Nerve Conduction Studies" at http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies.

neck pain, and deep vein thrombosis ("DVT"),[24] and prescribed Zaroxolyn,[25] Larix, Flexeril, and Avina. (Tr. 452-70.)

A May 24, 2005, MRI of the plaintiff's pelvis and right hip was negative (tr. 488), and a June 13, 2005, MRI of her right shoulder, although "limited by motion artifact," showed probable degeneration of her AC joint. (Tr. 487.)  A June 20, 2005, Respiratory Therapist Progress Note indicates that the plaintiff reported that after using a C-PAP machine for 15 months, she felt more rested, had increased energy, and had improved quality of life. (Tr. 431.)

On July 6, 2005, the plaintiff went to the NorthCrest Emergency Room with complaints of head and right shoulder pain after falling and hitting her head. (Tr. 439-44.)  She was found to have a normal range of motion in all four extremities. (Tr. 441.)  However, on July 7, 2005, the plaintiff presented to the emergency room at Skyline Medical Center with complaints of shoulder pain as a result of her fall. (Tr. 434.)  She was admitted to the hospital, where Dr. Murray Arons noted that x-rays did not show any significant shoulder trauma. *Id.*  Dr. Arons diagnosed the plaintiff with DVT, chronic pain syndrome, anemia, tobacco abuse, and hypokalemia, and prescribed Lovenox[26] and Coumadin,[27] and she was discharged from the hospital on July 8, 2005. (Tr. 435, 438.)

A July 14, 2005, MRI of the plaintiff's lumbar spine indicated that she had degenerative disc disease that was "more pronounced than on previous examinations" (tr. 481), and an August 11, 2005, MRI of her cervical spine showed "minimal disc bulging and probable tiny overlying

---

[24] DVT is "thrombosis of one or more of the deep veins of the lower limb, characterized by swelling, warmth, and erythema, frequently a precursor of a pulmonary embolism." Dorland's at 1907.

[25] Zaroxolyn is a diuretic. Saunders at 774.

[26] Lovenox is an anticoagulant that is prescribed to treat DVT. Saunders at 416.

[27] Coumadin is an anticoagulant. Saunders at 187.

osteophytes" but "[n]o stenosis or disc herniation . . . [or any] other abnormality [was] noted." (Tr. 478.)  An August 16, 2005, deep venous ultrasound on the plaintiff's lower left extremity revealed "[c]ontinued evidence of some thrombus within the mid superficial femoral vein" which "likely" represented DVT. (Tr. 476.)

On March 10, 2006, the plaintiff presented to the NorthCrest Emergency Room with complaints of lower leg pain caused by a blood clot, mild shortness of breath, and pain from her mid back to her chest, and she reported that she had not taken anticoagulant medication since August of 2005. (Tr. 826.)  Treatment notes indicate that the plaintiff had a normal range of motion in all four of her extremities but that her left calf and thigh were tender. (Tr. 828.)  An MRI of her chest was unremarkable (tr. 835), and an MRI and ultrasound of her lower left leg showed an "old fibrin clot" but "no definite acute DVT." (Tr. 836-38.)  The plaintiff was prescribed Lodine[28] and discharged from the emergency room on the same day in stable condition. (Tr. 839.)

### B. Physical Evaluations

On November 20, 2003, Tennessee Disability Determination Section ("DDS") non-examining physician George W. Bounds completed a physical Residual Functional Capacity ("RFC") assessment (tr. 304-09) and opined that the plaintiff could lift/carry 50 pounds occasionally and 25 pounds frequently. (Tr. 305.)  He found that in an eight hour workday the plaintiff could stand/walk and sit about six hours, was unlimited in her ability to push/pull, could frequently stoop, kneel, crouch, crawl, and climb ramps and stairs, and could occasionally kneel and climb ladders,

---

[28] Lodine is a NSAID prescribed to treat osteoarthritis, rheumatoid arthritis, and chronic pain. Saunders at 412.

rope, or scaffolding. (Tr. 306.)  Dr. Bounds also noted that the plaintiff's complaints of pain were partially credible in view of her physical evaluations and mental findings. (Tr. 306, 308.)

On December 13, 2004, Dr. Bruce Davis, a consultative DDS physician, examined the plaintiff (tr. 418-21) and noted that she moved slowly on and off the exam table and moved painfully across the room; had tenderness, pain, and reduced motion in her neck; had pain and tenderness but a normal range of motion in her shoulder, and had back pain. (Tr. 419-20.)  He diagnosed her with extreme obesity, hypertension, chest pain, cervical and lumbar disc disease, "[c]igarette associated lung disease," sleep apnea, anxiety, depression, and incontinence. (Tr. 420.)  Dr. Davis opined that the plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, and that in an eight hour workday stand/walk four to six hours and sit for eight hours. *Id.*  He also determined that the plaintiff's ability to bend and to squat was limited, that her exposure to heat, humidity, and irritating inhalants should be limited, and that she should avoid climbing and heights. *Id.*  An x-ray, taken on the same day, of the plaintiff's lumbar spine showed normal vertebral height and alignment and minimal scoliosis. (Tr. 422.)

On December 20, 2004, Dr. Louise Patikas, a consultative non-examining DDS physician, completed a physical RFC assessment (tr. 423-30) and opined that she could lift/carry 50 pounds occasionally and 25 pounds frequently.  She found that in an eight hour workday the plaintiff could stand/walk and sit about 6 hours, and that her ability to push/pull was unlimited.  (Tr. 424.) Dr. Patikas also noted that the plaintiff could frequently climb, balance, stoop, kneel, crouch, and crawl, and that the objective evidence suggested that her "allegations of severe pain" and decreased functioning were "not entirely credible." (Tr. 424-25.)

On June 6, 2006, Dr. Rhodes completed a physical Medical Source Statement of Ability to Do Work-Related Activities ("Medical Source Statement") on the plaintiff (tr. 448-51) and opined that she could lift/carry less than ten pounds both occasionally and frequently. (Tr. 448.) He noted that in an eight hour workday the plaintiff could stand/walk for less than two hours and "must periodically alter between sitting and standing to relieve pain or discomfort." (Tr. 448-49.) Dr. Rhodes concluded that the plaintiff's ability to push/pull was limited in her lower extremities; that she could never climb, balance, kneel, crouch, crawl, or stoop; that her ability to reach was constantly limited; and that her ability to handle, finger, and feel was frequently limited. (Tr. 449-50.) He also found that the plaintiff's exposure to temperature extremes, noise, dust, vibration, humidity/wetness, hazards, fumes, odors, chemicals, and gases should be limited. (Tr. 451.)

### C. Mental Health Records

On October 12, 2003, the plaintiff went to the Emergency Room at NorthCrest with complaints of depression and suicidal ideation. (Tr. 251.) Dr. Robert Brock Allen diagnosed the plaintiff with sleep pattern changes, depression, and suicidal ideation, and prescribed Ativan.[29] (Tr. 240, 251, 253.) The plaintiff's condition was stabilized and she was transferred, by police, to Middle Tennessee Mental Health Institute (MTMHI) for further treatment. (Tr. 240.) The plaintiff was admitted to MTMHI on October 13, 2003, and she reported that her stressors were chronic pain, her mother's Alzheimer's disease, and depression. (Tr. 268.) It was noted that the plaintiff was depressed, hopeless, and suicidal, and she was diagnosed with major depressive disorder. *Id.* Dr. Rudra Prakash, a psychiatrist, examined the plaintiff and diagnosed her with severe recurrent

---

[29] Ativan is a sedative. Saunders at 68.

major depressive disorder with no psychotic features,[30] dysthymia, post-traumatic stress disorder ("PTSD"), generalized anxiety disorder, alcohol abuse,[31] hypertension, chronic neck and back pain, and obesity. (Tr. 264-66.) Dr. Prakash assigned the plaintiff a Global Assessment of Functioning ("GAF") score of 30,[32] encouraged the plaintiff to participate in aftercare, and prescribed Lexapro,[33] Zestril, Albuterol,[34] HCTZ,[35] aspirin, and ibuprofen. *Id.* The plaintiff was discharged from MTMHI on October 14, 2003. (Tr. 266.)

On October 16, 2003, the plaintiff presented to Centerstone with complaints of significant back pain, having difficulty "doing things around her home," and having difficulty managing stress. (Tr. 301.) The plaintiff was diagnosed with depression/mood disorder and was found to have poor problem-solving and coping skills. (Tr. 299.) From November of 2003 to July of 2006, the plaintiff presented to Centerstone on multiple occasions (tr. 283-303, 485-788) and treatment notes indicate that her mood/affect fluctuated between being appropriate and depressed, that her behavior was appropriate, that her thought process was normal, that she did not have suicidal ideation, that she

---

[30] Although Dr. Allen indicated that the plaintiff had no history of depression (tr. 211), Dr. Prakash noted that she had gone through "a similar period of feeling depressed and suicidal," including writing a suicide note, seven years before. (Tr. 264.) *See also* Activities of Daily Living Questionnaire (Tr. 118).

[31] The alcohol abuse diagnosis appears to have been based on the plaintiff's reported history of six months of alcohol abuse in 1993. There is nothing else in the record to reflect any alcohol abuse.

[32] The GAF scale is used to assess the social, occupational, and psychological functioning of adults. A GAF score of 21-30 falls within the range of "[b]ehavior is considerably influenced by delusions or hallucinations [or] serious impairment in communication or judgment [or] inability to function in almost all areas." Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV-TR").

[33] Lexapro is sued to treat major depression and general anxiety disorder. Saunders at 405.

[34] Albuterol is an inhaler used in treatment or prevention of bronchospasms. PDR at 3393.

[35] HCTZ is a diuretic. Saunders at 351.

is the primary care giver of her elderly mother, that her anxiety increases around others, that she has chronic pain, and that her "progress towards service plan goals [were] fair to poor." *Id.* The plaintiff was diagnosed with chronic adjustment disorder with mixed anxiety and depressed mood, depressive disorder, NOS [not otherwise specified], a bulging disc, and degenerative arthritis, and she was repeatedly assigned a GAF score of 50.[36] (Tr. 303, 523, 534, 540, 555, 567, 608, 629, 650, 663, 678, 711, 726, 745, 756, 772.) The plaintiff was prescribed Ambien, Cymbalta,[37] Lunesta,[38] Paxil,[39] and Trazodone[40] (tr. 783-87) and she reported that Paxil improved her mood (tr. 742, 753) and that Cymbalta helped her depression and back and leg pain. (Tr. 520, 531.)

### D. Psychological Evaluations

On October 16, 2003, a Tennessee Clinically Related Group ("CRG") assessment completed at Centerstone indicated that the plaintiff's activities of daily living were not limited but that she was moderately limited in interpersonal functioning and concentration, task performance, and pace due to a mood disorder, and in adaptation to change due to evidence of poor coping and problem-solving skills as demonstrated by her suicidal ideations. (Tr. 278-79.) The plaintiff was assigned a GAF score of 50 and was classified as a person who was "Formerly Severely Impaired." (Tr. 280.)

---

[36] A GAF score of 41-50 falls within the range of "[s]erious symptoms [or] any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

[37] Cymbalta is prescribed for major depressive disorder, generalized anxiety disorder, diabetic neuropathic pain, and fibromyalgia. PDR at 1872.

[38] Lunesta is a sedative prescribed for insomnia. Saunders at 418.

[39] Paxil is prescribed for the treatment of major depressive disorder and general anxiety disorder. Saunders at 536.

[40] Trazodone is an antidepressant and "serotonin uptake inhibitor" that is used to control "aggressive behavior, alcoholism, panic disorder, agoraphobia, and cocaine withdrawal." Saunders at 716.

Formerly severely impaired was defined as "not recently severely impaired" but "severely impaired in the past" and in "need [of] services to prevent relapse." *Id.*

On December 19, 2003, Dr. George T. Davis, Ph.D., a non-examining DDS consultant, completed a Psychiatric Review Technique Form ("PRTF") (tr. 310-22) and diagnosed the plaintiff with affective disorder, anxiety disorder, and substance addiction disorder. (Tr. 310.) He concluded that the plaintiff had mild restriction of activities of daily living; moderate difficulties in maintaining social functioning, concentration, persistence, or pace; and one or two episodes of decomposition. (Tr. 320.) Dr. Davis also noted that the plaintiff's activities of daily living were "good" and "indicate a moderate impairment," that his findings were consistent with the opinion of her treating physician, and that her "allegations are credible." (Tr. 322.) Dr. Davis then completed a mental RFC assessment (tr. 324-26) and opined that the plaintiff was moderately limited in her "ability to maintain attention and concentration for extended periods;" in her "ability to complete a normal workday and workweek;" and in her "ability to interact appropriately with the general public." (Tr. 324-25.)

A February 16, 2004, CRG assessment completed at Centerstone indicated that the plaintiff was moderately limited in activities of daily living, interpersonal functioning and in adaptation to change and mildly limited in concentration, task performance, and pace. (Tr. 513-15.) She was assigned a GAF score of 50 and was classified as "Formerly Severely Impaired." (Tr. 515.) A June 15, 2004, CRG assessment completed at Centerstone showed that the plaintiff was moderately limited in activities of daily living, mildly limited in interpersonal functioning and adaptation to

change, and was not limited in concentration, task performance, and pace. (Tr. 510-11.)  She was

assigned a GAF score of 53[41] and was again classified as "Formerly Severely Impaired." (Tr. 515.)

On September 22, 2004, Marie E. La Vasque, a licensed psychological examiner, completed

a Mental Status Report (tr. 402-04) and the plaintiff reported that her daily activities consisted of

caring for her mother, doing "some" laundry, washing dishes, shopping, and doing minimal house

cleaning when she has "sufficient energy to clean." (Tr. 403.)  Ms. La Vasque noted that the plaintiff

had a mildly depressed mood but did not have suicidal ideations, displayed organized thinking and

good judgment, and reported no evidence of delusions. (Tr. 403-04.)  She diagnosed the plaintiff

with adjustment disorder with depressed mood and assigned her a GAF score of 80.[42] (Tr. 404.)

Ms. La Vasque also determined that the plaintiff would have no difficulty understanding or

remembering detailed directions, sustaining concentration and persistence, interacting with others,

or adapting to changes and requirements. *Id.*

An October 13, 2004, CRG assessment completed at Centerstone indicated that the plaintiff

was mildly limited in activities of daily living, in concentration, task performance, and pace, and in

adaptation to change and moderately limited in interpersonal functioning. (Tr. 507-09.)  She was

assigned a GAF score of 50 and was again classified as "Formerly Severely Impaired." (Tr. 509.)

On October 24, 2004, Dr. Edward L. Sachs, Ph.D., a consultative examiner, completed a

PRTF (tr. 405-17) and diagnosed the plaintiff with affective disorder with depressed mood.

(Tr. 408.)  He concluded that the plaintiff had mild restriction of activities of daily living and mild

---

[41] A GAF score within the range of 51-60 means that the plaintiff has "[m]oderate symptoms [or] moderate difficulty in social, occupational, or school functioning." DSM-IV-TR at 34.

[42] A GAF score within the range of 71-80 means that "[i]f symptoms are present, they are transient and expectable reactions to psychosocial stressors; no more slight impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

-18-

difficulties in maintaining social functioning, concentration, persistence, or pace, and had no episodes of decomposition. (Tr. 415.) Dr. Sachs also noted that the plaintiff's allegations of depression were credible but that her psychological evaluations and activities of daily living indicated that she suffered from "no significant psych[ological] related loss of functioning." (Tr. 417.)

CRG Assessments of the plaintiff were completed at Centerstone in February, June, and October of 2005. The February of 2005 CRG assessment indicated that the plaintiff was mildly limited in activities of daily living, in interpersonal functioning, in concentration, task performance, and pace and was moderately limited in adaptation to change. (Tr. 504-06.) She was assigned a GAF score of 50. (Tr. 506.) The June of 2005 CRG assessment indicated that the plaintiff was mildly limited in activities of daily living, was moderately limited in interpersonal functioning and adaptation to change, and was not limited in concentration, task performance, and pace. (Tr. 501-02.) She was assigned a GAF score of 52. (Tr. 503.) Finally, the October of 2005 CRG assessment indicated that the plaintiff was mildly limited in activities of daily living, in interpersonal functioning, in concentration, task performance, and pace, and in adaptation to change. (Tr. 498-500.) She was assigned a GAF score of 50. (Tr. 500.) In each of the 2005 CRG assessments, the plaintiff was classified as "Formerly Severely Impaired." (Tr. 500, 503, 506.)

An April 6, 2006, CRG assessment completed at Centerstone indicated that the plaintiff's activities of daily living were not limited but that she was mildly limited in interpersonal functioning, in concentration, task performance, and pace, and in adaptation to change. (Tr. 495-97.) She was assigned a GAF score of 50 and again was classified as "Formerly Severely Impaired." (Tr. 497.)

### E. Hearing Testimony

At the hearing before the ALJ, the plaintiff was represented by counsel, and the plaintiff and Dr. Kenneth Anchor, Ph.D., a vocational expert ("VE"), testified. (Tr. 1012-56.) The plaintiff testified that she graduated from high school and worked as a cook, cashier, subassembler, and assistant manager at a grocery store. (Tr. 1015-20.) She testified that she has excruciating pain in her neck that radiates down her arms and back, had neck surgery in January of 2005, has low back pain that radiates down her legs, uses a cane to prevent herself from falling, wears a back brace, has herniated thoracic discs, and stopped receiving treatment for her chronic pain in 2005 because she lost her insurance coverage. (Tr. 1021-26.) The plaintiff related that her back pain causes her to frequently change positions and lie down for four hours out of an eight hour work day. (Tr. 1026.)

The plaintiff testified that she weighs 263 pounds, has difficulty driving, has sleep apnea and uses a C-PAP machine, has bilateral carpal tunnel syndrome, has weak grip strength, and has urinary incontinence. (Tr. 1026-30.) She related that DVT causes swelling in her left leg, that she has a degenerative AC joint in her right shoulder that prevents her from raising her arm "up very high," and that she has a cleaning lady that "helps clean the house and stuff." (Tr. 1031-32.) The plaintiff testified that she lives with her mother, who has dementia, and that a care-giver comes in and takes care of her mother five days a week. (Tr. 1033.)

The plaintiff related that she has depression and anxiety (tr. 1034) and meets once a month with a therapist at Centerstone. (Tr. 1042.) She testified that she uses a motorized cart to get around a store when she goes shopping, that she can stand or sit for 30 minutes at a time, that she is "[b]arely" able to lift a gallon of milk, that she has people help her with household chores, that her

brother does the yard work, that she has difficulty getting dressed and is not able to tie her own shoes, and that her pain is getting worse. (Tr. 1043-45.)

The VE, consistent with the Dictionary of Occupational Titles, classified the plaintiff's past relevant work as a cashier as light and semiskilled, her job as a parts assembler as light and unskilled, her job as an assistant manager as light and skilled, and her job as a fast food worker as light and unskilled. (Tr. 1049.) The ALJ then instructed the VE to determine what type of work the plaintiff could perform if she were limited to light work; could stand for four hours in an eight hour work day and for no more than 1 hour at a time; could occasionally reach overhead; could not climb ladders, ropes, or scaffolds; should avoid exposure to extremes in temperature, dampness, wetness, humidity, fumes, odors, dust, and gasses; could not crawl, crouch, or kneel; and could only occasionally climb stairs, balance, stoop, or bend. (Tr. 1049-50.) The VE replied that she could perform her past work as an assistant manager. (Tr. 1050.)

The ALJ then asked the VE to consider what type of work the plaintiff could perform if she had limited neck mobility and could not constantly handle items, and the VE replied that she could perform her past work as an assistant manager. *Id.* Next, the ALJ asked the VE to consider what type of work the plaintiff could perform if she had moderate limitations in maintaining attention and concentration due to pain and sleep apnea associated fatigue, and the VE replied that she could not perform any of her past jobs but could work as a general clerk, office clerk, inspector, telephone quotation clerk, telephone operator, and information clerk. (Tr. 1051-52.) The ALJ then asked the VE to consider Dr. Rhodes's RFC assessment (tr. 1052) and the work that the plaintiff could perform, and the VE testified that there was insufficient information in Dr. Rhodes's evaluation to determine whether the plaintiff could perform a full or reduced range of sedentary work. (Tr. 1053-

54.)  The VE also testified that an ongoing pattern of lying down, which occurred during unscheduled breaks or for as much as four hours in an eight hour workday, would preclude the plaintiff from working. (Tr. 1054.)

The ALJ asked the VE to consider what type of work the plaintiff could perform if she had marked limitations in concentration and attention due to pain and fatigue, and he replied that the plaintiff would be precluded from working. (Tr. 1053.)  The VE also related that if the plaintiff's testimony was fully credible then she would be precluded from working. *Id.*  Finally, the VE related that an individual with GAF scores of 50 or below indicates a serious impairment and "rule[s] out the vast majority of jobs." (Tr. 1055.)

## III.  THE ALJ'S FINDINGS

The ALJ issued an unfavorable decision on March 9, 2007. (Tr. 16-24.)  Based on the record, the ALJ made the following findings:

1.    The claimant meets the insured status requirements of  the Social Security Act through June 30, 2008.

2.    The claimant has not engaged in substantial gainful activity since June 25, 2003, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq*., 416.920(b) and 416.971 *et seq*.).

3.    The claimant has the following severe impairments: vertebrogenic (e.g.), cervical stenosis), history of deep vein thrombosis [hereinafter *DVT*], mild obstructive sleep apnea, psychiatric (e.g., depressive disorder), and carpal tunnel syndrome [20 CFR 404.1520(c) and 416.920(c)].

* * *

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR

404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

5.  The claimant has the residual functional capacity to meet the primary strength demands of Light Work.

                                    * * *

6.  The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

                                    * * *

7.  The claimant was born on May 11, 1967 and was 36-years-old, which is defined as a younger individual age 18-44, on the alleged disability onset date (20 CFR 404.1563 and 416.963.)

8.  The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964.)

9.  Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

                                    * * *

11. The claimant has not been under a disability, as defined in the Social Security Act, from June 25, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. 18-23.

## IV. DISCUSSION

### A. Standard of Review

The determination of disability under the Act is an administrative decision, and the only questions before this Court are whether the decision of the Commissioner is supported by substantial evidence and whether the Commissioner employed the proper legal standards in reaching his conclusion. 42 U.S.C. § 405(g). *See Richardson v. Perales*, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971) (adopting and defining substantial evidence standard in context of Social Security cases); *Kyle v. Comm'r Soc. Sec.*, 609 F.3d 847, 854 (6th Cir. 2010). The Commissioner's decision must be affirmed if it is supported by substantial evidence, "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009) (quoting *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir.1997)); *Jones* v. *Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003); *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999). Substantial evidence is defined as "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S. Ct. 206, 83 L. Ed. 126 (1938)); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *Le Master v. Weinberger*, 533 F.2d 337, 339 (6th Cir. 1976) (quoting Sixth Circuit opinions adopting language substantially similar to that in *Richardson*).

A reviewing court may not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility. *See, e.g., Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984) (citing *Myers v. Richardson*, 471 F.2d 1265, 1268 (6th Cir. 1972)). The Court must accept the ALJ's explicit findings and determination unless the record as a whole is without substantial evidence to

support the ALJ's determination.  42 U.S.C. § 405(g).  *See, e.g., Houston v. Sec'y of Health & Human Servs.*, 736 F.2d 365, 366 (6th Cir. 1984).

The Commissioner must employ a five-step evaluation process in determining the issue of disability.  *See, e.g., Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001) (citing *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990)).  The original burden of establishing disability is on the plaintiff, and impairments must be demonstrated by medically acceptable clinical and laboratory diagnostic techniques.  *See* 42 U.S.C. § 1382c(a)(3)(D); 20 C.F.R. §§ 404.1512(a), (c), 404.1513(d). First, the plaintiff must show that she is not engaged in "substantial gainful activity" at the time she seeks disability benefits.  *Id.* (citing 20 C.F.R. §§ 404.1520(b), 416.920(b)); *Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 539 (6th Cir. 2007).  A plaintiff who is performing substantial gainful activity is not disabled no matter how severe the plaintiff's medical condition may be.  *See, e.g., Dinkel v. Sec'y of Health & Human Servs.*, 910 F.2d 315, 318 (6th Cir. 1990).

Second, the plaintiff must show that she suffers from a "severe impairment."  A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." *Id.* (citing 20 C.F.R. §§ 404.1520(c), 416.920(c)).  Basic work activities are "the abilities and aptitudes necessary to do most jobs," such as "walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b).  The Commissioner is required to consider the combined effects of impairments that individually are not severe but cumulatively may constitute a severe impairment. 42 U.S.C. § 423(d)(2)(B); *Foster v. Bowen*, 853 F.2d 483, 490 (6th Cir. 1988).

Third, if the plaintiff is not engaging in substantial gainful activity and is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and her impairment meets or equals a listed impairment, the plaintiff is presumed disabled without further inquiry, regardless of age, education or work experience. *Id.* (citing 20 C.F.R. §§ 404.1520(d), 416.920(d)). The plaintiff may establish that she meets or equals a listed impairment, and that the impairment has lasted or is expected to last for at least twelve months or result in death. *See Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 350 (6th Cir. 1988). The plaintiff is not required to show the existence of a listed impairment in order to be found disabled, but such a showing results in an automatic finding of disability. *See Blankenship v. Bowen*, 874 F.2d 1116, 1122 (6th Cir. 1989).

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, she is not disabled. *Id.* The plaintiff has the burden of proving inability to perform past relevant work, or proving that a particular past job should not be considered relevant. *Cruse*, 502 F.3d at 539; *Jones*, 336 F.3d at 474 ("Through step four, the [plaintiff] bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work."); *Smith v. Sec'y of Health & Human Servs.*, 893 F.2d 106, 109 (6th Cir. 1989). If the plaintiff fails to carry this burden, she must be denied disability benefits.

Once the plaintiff establishes a *prima facie* case that she is unable to perform her prior relevant employment, the burden shifts in step five to the Commissioner to show that the plaintiff can perform other substantial gainful employment, and that such employment exists in the national economy. *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005); *See, e.g., Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994). To rebut a *prima facie* case, the Commissioner must

come forward with proof of the existence of other jobs a plaintiff can perform. *Longworth*, 402 F.3d at 595; *See Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 528 (6th Cir. 1981), *cert. denied*, 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983) (upholding the validity of the medical-vocational guidelines grid as a means for the Commissioner of carrying his burden under appropriate circumstances). It remains the plaintiff's burden to prove the extent of her functional limitations. *Her*, 203 F.3d at 391. Even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the plaintiff can perform, she is not disabled. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 652 (6th Cir. 2009); *Her*, 203 F.3d at 391. *See also Tyra v. Sec'y of Health & Human Servs.*, 896 F.2d 1024, 1028-29 (6th Cir. 1990); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 88-89 (6th Cir. 1985); *Mowery v. Heckler*, 771 F.2d 966, 969-70 (6th Cir. 1985).

If the question of disability can be resolved at any point in the sequential evaluation process, the claim is not reviewed further. 20 C.F.R. § 404.1520(a)(4). *See also Higgs v. Bowen*, 880 F.2d 860, 863 (6th Cir. 1988) (holding that resolution of plaintiff's claim at step two of the evaluative process is appropriate in some circumstances).

### B. The Five-Step Inquiry

In this case, the ALJ decided the plaintiff's claim at step five of the five-step process. (Tr. 23.) At step one, the ALJ found that the plaintiff demonstrated that she had not engaged in substantial gainful activity since June 25, 2003, the alleged onset of disability. (Tr. 18.) At step two, the ALJ determined that the plaintiff's vertebrogenic disorder, cervical stenosis, DVT, mild obstructive sleep apnea, depressive disorder, and carpal tunnel syndrome were severe impairments.

*Id.* At step three, the ALJ found that the plaintiff's impairments, either singly or in combination, did not meet or medically equal one of the listed impairments in Appendix 1, Subpart P, Regulation 4. (Tr. 19.) At step four, the ALJ determined that the plaintiff had an RFC to perform a limited range of light work but could not perform her past jobs as a cashier, sub-assembler, or assistant manager. (Tr. 22.) At step five, the ALJ concluded that the plaintiff's RFC allowed her to perform work as a general clerk, office clerk, telephone quotation clerk, telephone operator, and information clerk. (Tr. 23.)

### C. Plaintiff's Assertions of Error

The plaintiff contends that the ALJ did not properly evaluate the opinion of her treating physician, erred in identifying and considering all of her severe impairments, and did not properly evaluate her credibility, her RFC, or her mental impairments. Docket Entry No. 18, at 21-30. She also argues that the hypothetical questions posed by the ALJ to the VE did not include all of her physical and mental impairments. *Id.* at 30.

#### 1. The ALJ's failure to properly assess the medical evidence of the plaintiff's treating physician is harmless error.

The plaintiff contends that the ALJ erred in failing to evaluate Dr. Rhodes's June 6, 2006, Medical Source Statement. Docket Entry No. 18, at 29. The Commissioner concedes that the ALJ "did not articulate what weight he was giving to Dr. Rhodes's [Medical Source Statement]" but he argues that it was harmless error. Docket Entry No. 22, at 22-23.

Given the regularity with which Dr. Rhodes examined the plaintiff (tr. 388-98, 452-70, 448-51), he is classified as a treating source under 20 C.F.R. § 404.1502.[43]  Treating physicians are "the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from objective medical findings alone." 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Generally, an ALJ is required to give "controlling weight" to the medical opinion of a treating physician, as compared to the medical opinion of a non-treating physician, if the opinion of the treating source is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." *Id.* (quoted in *Tilley v. Comm'r of Soc. Sec.*, 394 Fed. Appx. 216, 222 (6th Cir. Aug. 31, 2010); *Hensley v. Astrue*, 573 F.3d 263 (6th Cir. 2009).   This is commonly known as the treating physician rule. *See* Soc. Sec. Rul. 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004).

As the plaintiff correctly points out, even if a treating source's medical opinion is not given controlling weight, it is "still entitled to deference and *must be weighed using all of the factors provided in 20 C.F.R. 404.1527 . . . .*" *Fisk v. Astrue*, 253 Fed. Appx. 580, 585 (6th Cir. Nov. 9,

---

[43] A treating source, defined by 20 C.F.R. § 404.1502, is

your own physician, psychologist, or other acceptable medical source who provides you, or has provided you, with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with you.  Generally, we will consider that you have an ongoing treatment relationship with an acceptable medical source when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required for your medical condition(s).  We may consider an acceptable medical source who has treated or evaluated you only a few times or only after long intervals (e.g., twice a year) to be your treating source if the nature and frequency of the treatment or evaluation is typical for your condition(s).

2007) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *4) (emphasis in original). The ALJ must consider

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) the supportability of the opinion with respect to relevant evidence such as medical signs and laboratory findings; (4) the consistency of the opinion with the record as a whole; (5) the specialization of the physician rendering the opinion; and (6) any other factor raised by the applicant.

*McGrew v. Comm'r of Soc. Sec.*, 343 Fed. Appx. 26, 30 (6th Cir. Aug. 19, 2009) (citing *Wilson*, 378 F.3d at 544); *Meece v. Barnhart*, 192 Fed. Appx. 456, 461 (6th Cir. Aug. 8, 2006) (quoting 20 C.F.R. § 404.1527(d)(2)-(6)). The ALJ must also provide "good reasons" for the resulting weight given to the treating source. Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5 (citing 20 C.F.R. § 404.1527(d)(2)); *Brock v. Comm'r of Soc. Sec.*, 2010 WL 784907, at *2 (6th Cir. Mar. 8, 2010). The "good reasons" must be "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight," *Karger v. Comm'r of Soc. Sec.*, 2011 WL 477682, at *13 (6th Cir. Feb. 10, 2011) (quoting Soc. Sec Rul. 96-2p, 1996 WL 374188, at *5), and so that the plaintiff understands the disposition of her case. *Wilson*, 378 F.3d at 544 (citing *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir. 1999)).

The Sixth Circuit has also acknowledged that an ALJ's failure to comply with 20 C.F.R. § 404.1527(d)(2) and the good reasons requirement could constitute harmless error if the "treating source's opinion is so patently deficient that the Commissioner could not possibly credit it," if "the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion," *Wilson*, 378 F.3d at 547, or if the ALJ "*indirectly* attack[s] the supportability of the treating physician's opinion or its consistency with other evidence in the record." *Coldiron*, 391 Fed. Appx. at 440 (emphasis in original). In this case, the ALJ failed to assign any weight to Dr.

Rhodes's Medical Source Statement, did not discuss any of his medical findings, and only once cited to his Medical Source Statement, as "Exhibit 26F." (Tr. 20.) However, when the VE was asked what type of sedentary work Dr. Rhodes's Medical Source Statement indicated that the plaintiff could perform, he replied "I'm not sure there's enough information [in the Medical Source Statement], really, to be responsive to that question." (Tr. 1054.) Dr. Rhodes did not fully assess the plaintiff's ability to sit in an eight hour workday, thus rendering his Medical Source Statement incomplete and "patently deficient." *Id.*

Since Dr. Rhodes's Medical Source Statement is patently deficient, the ALJ's failure to comply with 20 C.F.R. § 404.1527(d)(2) is harmless error and further consideration on remand would be unavailing. *See Wilson*, 378 F.3d at 547 (citing *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6, 89 S.Ct. 1426, 22 L.Ed.2d 709 (1969) (Courts are not required to "convert judicial review of agency action into a ping-pong game" where "remand would be an idle and useless formality.")).

### 2. The ALJ properly considered all of the plaintiff's impairments except for her obesity.

The plaintiff argues that the ALJ did not properly identify or consider all of her severe impairments. She contends that the ALJ erred by not specifically identifying her degenerative lumbar disc disease, lumbar disc protrusion, degenerative cervical disc disease, cervical spondylosis, herniated cervical disc, herniated thoracic disc, hypersomnia, PTSD, generalized anxiety disorder, adjustment disorder with mixed anxiety and depressed mood, and obesity. Docket Entry No. 18, at 27-28.

According to 20 C.F.R. § 404.1520(c), which codifies step two of the five step sequential process, an impairment is considered severe if that impairment "limits your physical or mental ability to do basic work activities." *See also* 20 C.F.R. § 404.1521 ("An impairment or combination of impairments is not severe if it does not significantly limit your physical or mental ability to do basic work activities."); *Murphy v. Sec'y of Health & Human Servs.*, 801 F.2d 182, 185 (6th Cir. 1986) ("An impairment can be considered not severe only if the impairment would not affect the plaintiff's ability to work regardless of his age, education, and work experience.") (citing *Salmi v. Sec'y of Health & Human Servs.*, 774 F.2d 685, 691-92 (6th Cir. 1985); *Farris v. Sec'y of Health & Human Servs.*, 773 F.2d 85, 90 (6th Cir. 1985)). The Regulations define basic work activities as being the "'abilities and aptitudes necessary to do most jobs,' and include: (1) physical functions; (2) the capacity to see, hear and speak; (3) '[u]nderstanding, carrying out, and remembering simple instructions;' (4) '[u]se of judgment;' (5) '[r]esponding appropriately to supervision, co-workers, and usual work situations;' and (6) '[d]ealing with change in a routine work setting.'" *Simpson v. Comm'r Soc. Sec.*, 344 Fed. Appx. 181, 190 (6th Cir. Aug. 27, 2009) (quoting 20 C.F.R. §§ 404.1521(a)-(b) and 416.921(a)-(b)).

The Sixth Circuit has construed the step two severity determination as a "de minimis" hurdle in the five step sequential process, but it still effectively screens out "claims that are 'totally groundless' solely from a medical standpoint." *Higgs*, 880 F.2d at 862-63 (quoting *Farris*, 773 F.2d at 89-90 and citing *Murphy*, 801 F.2d at 185). An ALJ's

> failure to consider whether a specific impairment is "severe" is not reversible error if the ALJ found the claimant to suffer from a severe impairment and went on to the remaining steps in the disability evaluation, and, in that process, has the opportunity to consider the other allegedly severe impairment(s) in determining whether the claimant retains sufficient residual functional capacity to allow him to perform substantial gainful activity.

*Langford v. Astrue,* 2011 WL 1466513, at *8 (M.D. Tenn. Apr. 18, 2011) (Wiseman, J.) (citing

*Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)). In *Maziarz*, the

plaintiff contended that the ALJ erred in failing to identify his cervical condition as a severe

impairment. The Sixth Circuit rejected the plaintiff's argument, finding that

> [a]ccording to the regulations, upon determining that a claimant has one severe
> impairment, the Secretary must continue with the remaining steps in his disability
> evaluation as outlined above. In the instant case, the Secretary found that Maziarz
> suffered from the severe impairment of coronary artery disease, status post right
> coronary artery angioplasty and angina pectoris. Accordingly, the Secretary
> continued with the remaining steps in his disability determination. Since the
> Secretary properly could consider claimant's cervical condition in determining
> whether claimant retained sufficient residual functional capacity to allow him to
> perform substantial gainful activity, the Secretary's failure to find that claimant's
> cervical condition constituted a severe impairment could not constitute reversible
> error.

*Maziarz*, 837 F.2d at 244.

In this case, the ALJ determined that the plaintiff suffered from multiple severe impairments,

specifically, "vertebrogenic (e.g., cervical stenosis), DVT, mild obstructive sleep apnea, psychiatric

(e.g., depressive disorder), and carpal tunnel syndrome." (Tr. 18.) In analyzing how those

impairments affected the plaintiff's residual functional capacity, the ALJ considered "all symptoms

and the extent to which these symptoms can reasonably be accepted as consistent with the objective

medical evidence and other evidence." (Tr. 21.) He specifically mentioned the plaintiff's PTSD,

anxiety disorder (tr. 18), lumbar degenerative disc disease, and herniated cervical disc (tr. 20), and

considered Dr. Mathews's July 19, 2004, treatment note indicating that the plaintiff had a mild

thoracic disc herniation (tr. 399), an August 17, 2004, MRI of the plaintiff's spine which showed

evidence of cervical spondylosis (tr. 866-67), and Centerstone treatment notes that indicated that the

plaintiff was diagnosed with adjustment disorder. (Tr. 726, 745, 756, 772.) *See Hamilton v. Astrue,*

2010 WL 411322, at *7-8 (N.D. Ohio Jan. 28, 2010) (Although the ALJ determined that the plaintiff had only one severe mental impairment, the Court concluded that he properly considered her other psychological impairments since he relied upon the evaluations of other physicians who had diagnosed the plaintiff with those other psychological impairments.).

The two remaining impairments that the plaintiff contends that the ALJ did not consider are hypersomnia and obesity. On January 31, 2005, Dr. Chadalavada completed a sleep study and opined that the plaintiff had mild obstructive sleep apnea and hypersomnia. (Tr. 489-90.) According to WebMD, hypersomnia is excessive sleepiness and can be caused by sleep apnea. WebMD, "Sleep and Hypersomina" at http://www.webmd.com/sleep- disorders/hypersomnia. Therefore, when the ALJ concluded that the plaintiff's mild obstructive sleep apnea, the cause of the plaintiff's hypersomnia, was a severe impairment, he implicitly considered the plaintiff's hypersomnia. (Tr. 18.)

Finally, the plaintiff argues that the ALJ "failed to discern that she was extremely obese." Docket Entry No. 18, at 27. Social Security Ruling ("SSR") 02-01p, which details the Social Security Administration's ("SSA") policy on obesity, provides that even though the SSA no longer classifies obesity as a listed impairment, adjudicators must still consider its effects when evaluating an individual's residual functional capacity. Soc. Sec. Rul. 02-01p, 2000 WL 628049, at *1. SSR 02-01p further explains that "[a]n assessment should also be made of the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment," 2000 WL 628049, at *6, but it does not offer "'any particular procedural mode of analysis for disability claimants.'" *Coldiron v. Comm'r of Soc. Sec.*, 391 Fed. Appx. 435, 442-43

(6th Cir. Aug. 12, 2010) (quoting *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 412 (6th Cir. Jan. 31, 2006)).

While an ALJ's explicit discussion of the plaintiff's obesity indicates sufficient consideration of her obesity, *see Coldiron*, 391 Fed. Appx. at 443, the Sixth Circuit has also held that an "ALJ does not need to make specific mention of obesity if he credits an expert's report that considers obesity." *Bledsoe*, 165 Fed.Appx. at 412 (citing *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). The ALJ did not specifically mention the plaintiff's obesity in his decision nor did he rely upon or credit any medical report that included obesity as a factor affecting her physical activity.

The record includes notations or diagnoses of obesity by several health care providers. In January of 2002, Donna Hall, a family nurse practitioner at Family Health Care Associates of Greenbrier, noted that the plaintiff was obese. (Tr. 214.) In October of 2003, Dr. Rudra Prakash, a psychiatrist, diagnosed her, inter alia, with obesity. (Tr. 264.) In January of 2004, Dr. Avis Walters diagnosed her, inter alia, with morbid obesity. (Tr. 337.) In December of 2004, Dr. Bruce Davis, a consultative DDS physician, diagnosed the plaintiff, inter alia, with extreme obesity. (Tr. 420.) In January of 2005, Dr. Ramesh Chadalavada recommended that the plaintiff lose weight. (Tr. 490.)

The ALJ did not, however, even mention any of those health care providers, although he cited to Dr. Prakash's October 13, 2003, discharge summary for her mental health diagnoses. (Tr. 18, 264.) It could be argued that, by "crediting" and citing to Dr. Prakash's discharge summary, the ALJ implicitly considered the plaintiff's obesity. However, Dr. Prakash's diagnosis of the plaintiff's obesity had absolutely nothing to do with his treatment or diagnoses of her psychiatric

conditions. He did not treat her for any physical impairment and thus did not consider any effects her obesity had upon her physical activity.

The defendant did not even urge that the Court consider the ALJ's citation to Dr. Prakash's discharge summary as evidence of his indirect consideration of the plaintiff's obesity. Instead, the defendant suggests that the Court consider Dr. Davis's December 2004, opinion. Had the ALJ cited to Dr. Davis's opinion, the Court would have agreed with the defendant. However, the ALJ did not even mention Dr. Davis or his opinion. The Court simply cannot find that the ALJ complied with SSR 02-01p since there is no basis to conclude that the plaintiff's obesity was directly or indirectly factored into the ALJ's ruling when he did not even mention any medical report relating to her physical activity in which the plaintiff's obesity was noted.

### 3. The ALJ erred in analyzing the plaintiff's subjective complaints of pain.

The plaintiff contends that the ALJ erred in evaluating the credibility of her subjective complaints of pain. Docket Entry No. 18, at 21-26. The ALJ is charged with evaluating the credibility of the plaintiff at the hearing, and the ultimate decision of credibility rests with the ALJ. The ALJ's credibility finding is entitled to deference "because of the ALJ's unique opportunity to observe the claimant and judge her subjective complaints." *See Buxton v. Halter*, 246 F.3d 762, 773 (6th Cir. 2001) (internal citations omitted). However, "[i]f the ALJ rejects the claimant's complaints as incredible, he must clearly state his reason for doing so." *Wines v. Comm'r of Soc. Sec.*, 268 F. Supp.2d 954, 958 (N.D. Ohio 2003) (citing *Felisky*, 35 F.3d at 1036).

Social Security Ruling 96-7p emphasizes that credibility determinations must find support in the record, and not be based upon the "intangible or intuitive notion[s]" of the ALJ. 1996 WL

374186, at *4. In assessing the plaintiff's credibility, the ALJ must consider the record as a whole, including the plaintiff's complaints, lab findings, information provided by treating physicians, and other relevant evidence. *Id.* at *5. Consistency between the plaintiff's subjective complaints and the record evidence "tends to support the credibility of the [plaintiff], while inconsistency, although not necessarily defeating, should have the opposite effect." *Kalmbach v. Comm'r of Soc. Sec.,* 2011 WL 63602, at *11 (6th Cir. Jan. 7, 2011). The ALJ must explain his credibility determination such that both the plaintiff and subsequent reviewers will know the weight given to the plaintiff's statements and the reason for that weight. Soc. Sec. Rul. 96-7p, 1996 WL 374186, at *4.

Both the Social Security Administration ("SSA") and the Sixth Circuit have enunciated guidelines for use in analyzing a plaintiff's subjective complaints of pain. See 20 C.F.R. §§ 404.1529, 416.929; *Felisky*, 35 F.3d at 1037. While the inquiry into subjective complaints of pain must begin with the objective medical record, it does not end there. The Sixth Circuit in *Duncan v. Secretary of Health and Human Servs.*, 801 F.2d 847 (6th Cir. 1986), set forth the basic standard for evaluating such claims.[44] The *Duncan* test has two prongs. The first prong is whether there is objective medical evidence of an underlying medical condition. *Felisky*, 35 F.3d at 1039 (quoting *Duncan*, 801 F.2d at 853). The second prong has two parts: "(1) whether objective medical evidence confirms the severity of the alleged pain arising from the condition; or (2) whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." *Id.* This test does not require objective evidence of the pain itself. *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweiker*, 749 F.2d 1066, 1071 (3rd Cir. 1984)).

_____

[44] Although *Duncan* only applied to determinations made prior to 1987, the Sixth Circuit has since held that *Duncan* continues to apply to determinations made after 1987. *See Felisky*, 35 F.3d at 1039 n.2.

The ALJ concedes that there is objective medical evidence of the plaintiff's medically determinable impairments, satisfying the first prong of the *Duncan* test. (Tr. 21.) Given that the second prong of the *Duncan* test consists of two alternatives, the plaintiff must only meet one of the following two elements: the objective medical evidence "confirms the severity of the alleged pain arising from the condition" or the "objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged disabling pain." The SSA provides a checklist of factors to assess symptoms, including pain, in 20 C.F.R. §§ 404.1529(c), 416.929(c). The ALJ cannot ignore a plaintiff's statements detailing the symptoms, persistence, or intensity of her pain simply because current objective medical evidence does not fully corroborate the plaintiff's statements. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). Besides reviewing medical records to address the credibility of a plaintiff's symptoms of pain, an ALJ must review the entire case record in light of the seven factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 404.929(c)(3).[45]

In this case, the Commissioner argues that the ALJ explicitly considered multiple factors set forth in 20 C.F.R. §§ 404.1529(c)(3), 404.929(c)(3), including the plaintiff's activities of daily living; the location, duration, frequency, and intensity of her pain; the precipitating and aggravating factors of her pain; and the type, dosage, effectiveness and side effects of her medications. Docket Entry No. 22, at 20; Tr. 20-21. The ALJ did note that the plaintiff

---

[45] The seven factors under 20 C.F.R. §§ 404.1529(c)(3) and 416.929(c)(3) include: (i) the plaintiff's daily activities, (ii) the location, duration, frequency, and intensity of the plaintiff's pain or other symptoms, (iii) precipitating and aggravating factors, (iv) the type, dosage, effectiveness and side effects of any medication the plaintiff takes or has taken to alleviate pain or other symptoms, (v) treatment, other than medication, plaintiff received or has received for relief of pain or other symptoms, (vi) any measures plaintiff uses or has used to relieve pain or other symptoms (e.g. lying flat on her back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.), and (vii) other factors concerning plaintiff's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

testified that she fell five months after her neck surgery, and all physical treatment stopped in 2005 secondary to loss of her health insurance benefits. She said that she is never without back pain, which is getting worse to the point where she has to change the position of her body ever [sic] thirty minutes. She claimed that she cannot sustain prolonged sitting, standing or walking. She is right hand dominant and complained that her hands go numb. She also claimed that she needs to use a cane (with her left hand) to walk, and she complained that her grip is weak. She also testified that she finds it hard to raise her right shoulder secondary to a degenerative joint, and she has difficulty in using a vacuum secondary to her arm and/or back condition.

(Tr. 21.) However, the ALJ's discussion of the plaintiff's subjective complaints does not undercut the credibility of those complaints and, as the plaintiff correctly points out, the ALJ focuses significant portions of his decision to summarizing the record medical evidence instead of providing the plaintiff "with a reasoned analysis of [her] credibility." Docket Entry No. 25, at 2; Tr. 20-22.

In fact, the ALJ primarily focused on the care that the plaintiff afforded to her mother in concluding that her subjective complaints of pain were not credible and that she could still engage in substantial gainful activity. (Tr. 21-22.). The ALJ found that

[a]fter considering the evidence of record, the undersigned finds that the [plaintiff's] medically determinable impairments could reasonably be expected to produce some of the alleged symptoms, but that her testimony concerning the intensity, persistence and limiting effects of these symptoms was not entirely credible.

For instance, the [plaintiff] said that she lives with her disabled mother, but she claimed that she does not do that much for her mother. In fact, it does appear home health care is available. Perhaps the most compelling exhibit is the report of Steven B. Larson, M.D., who recommended that the [plaintiff] undergo occupational therapy. The [plaintiff] said she cannot take time off from care of her mother to do this. Noteworthy, [plaintiff's] carpal tunnel syndrome is only mild. Apparently that condition was not so bad that she could not look after her mother. Indeed, people care for invalids as companions as much as the [plaintiff] does.

[Plaintiff's] mental health treating source is full of references of the extent the [plaintiff] cares for her mother, who apparently became disabled about the time the [plaintiff] applied for Social Security benefits. Indeed, one compelling conversation between the [plaintiff] and her therapist involved the [plaintiff's] assertions that her siblings did not do enough. The therapist reminded the [plaintiff] that they all had

-39-

> good jobs and that the [plaintiff] is the logical person to care for her mother. While
> it is highly admirable that the [plaintiff] would work to keep her mother out of a
> nursing home facility or the like, doing so does suggest that she is capable of
> engaging in substantial gainful activity.

*Id.* (Internal footnotes omitted.) However, the ALJ mis-characterizes the plaintiff's testimony and

the record evidence. The plaintiff testified that, although she lives with her mother, a care-giver

comes to her home five days a week to take care of her mother and that when the care-giver is not

there that her brother, sister, or niece help take care of her mother. (Tr. 1033.) She then related that

a cleaning lady does the household chores; that her brother does the yard work; that she uses a

motorized cart to get around stores when she goes shopping; and that she has difficulty tying her

own shoes. (Tr. 1043-45.) She also reported that she has "difficulty doing things around her home"

(tr. 301), that she periodically has to sit and rest, and that caring for her mother is limited to giving

her medicine and feeding her. (Tr. 123.)

The ALJ's reliance on Dr. Larson's office note is also perplexing. As the plaintiff pointed

out, *see* Docket Entry No. 18, at 24, Dr. Larson saw the plaintiff one time for complaints of carpal

tunnel syndrome, at which time he referred her to "occupational therapy for routine carpal tunnel

rehab with wrist splints." (Tr. 899.) Clearly, Dr. Larson used the term "occupational therapy" to

cover therapy for the plaintiff's wrists and not to address therapy that would enable her to return to

work.

As noted in *Kalmbach*, "while credibility determinations regarding subjective complaints

rest with the ALJ, those determinations must be reasonable and supported by substantial evidence."

2011 WL 63602, at *13 (6th Cir. Jan. 7, 2011). In this case, the ALJ did not provide sufficient

specific reasons for his conclusion that the plaintiff's subjective complaints of pain were only

partially credible. He focused on the plaintiff's role as care-taker of her mother as support for his

determination (tr. 21-22), but, as evidenced by the plaintiff's own testimony, he overstated her role as care-taker. In sum, the ALJ's decision to find the plaintiff's subjective complaints of pain as only partially credible is not supported by substantial evidence in the record and constitutes reversible error.

The VE testified that, if the plaintiff's subjective complaints of pain were found to be credible, she would be precluded from performing work. (Tr. 1053-54.) Since the credibility of the plaintiff's subjective complaints of pain is outcome determinative in this case, the Court will not address the plaintiff's remaining assertions of error.

# VI. RECOMMENDATION

For the above stated reasons, it is respectfully recommended that the plaintiff's motion for judgment on the record (Docket Entry No. 17) be GRANTED and the defendant's motion for "judgment on the pleadings" (Docket Entry No. 21) be DENIED to the extent that the case should be remanded to the ALJ for further consideration of the credibility of the plaintiff's subjective complaints of pain and to consider the plaintiff's obesity in compliance with SSR 02-01p.

Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days of service of this Report and Recommendation and must state with particularity the specific portions of the Report and Recommendation to which objection is made. Failure to file written objections within the specified time can be deemed a waiver of the right to

appeal the District Court's Order regarding the Report and Recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

Respectfully submitted,

_____
JULIET GRIFFIN
United States Magistrate Judge